FILED
2014 Mar-31  AM 09:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JULIAN R. LEE, JR.**, | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO.: 2:12-CV-2935-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **as acting Commissioner of the Social** | ) | |
| **Security Administration**, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

On October 6, 2009, the claimant, Julian Lee, applied for a period of disability and disability insurance benefits under Title II of the Social Security Act. The claimant also applied for supplemental security income under Title XVI on September 14, 2009. (R. 21). In both applications, he alleges disability commencing on June 28, 2008, because of bipolar disorder, deteriorating discs in his back, an inability to concentrate, mood swings, anger, constant shoulder pain, and pinched nerves in his back. (R. 132, 172).

The Commissioner concurrently denied the claims on January 6, 2010. (R. 98-102). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on March 10, 2011. (R. 36).  In a decision dated March 24, 2011, the ALJ found that the claimant was not disabled as defined by the Social Security Act, and, thus, ineligible for disability insurance benefits and supplemental security income. (R. 31). On July 9, 2012, the Appeals Council denied the claimant's request for review; consequently, the ALJ's decision became the final decision

of the Commissioner of the Social Security Administration. (R. 1-6). The claimant has exhausted

his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and

1631(c)(3). For the reasons stated below, this court reverses and remands the decision of the

Commissioner.

## II. ISSUES PRESENTED

The issue presented is whether the ALJ's residual functional capacity assessment lacks

substantial evidence to support such a finding because the ALJ gave weight to an opinion that

she misread.

## III. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is limited. This court must affirm

the Commissioner's decision if she applied the correct legal standards and if substantial evidence

supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422

(11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999.  However, this court does not review the Commissioner's factual determinations *de

novo*. The court will affirm those factual determinations that are supported by substantial

evidence.  "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, ... but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e, that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the Plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart,* 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports the finding.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

At the fourth step, the ALJ must make an assessment of the claimant's RFC. *See Phillips v. Barnhart,* 357 F.3d 1232, 1238 (11th Cir. 2004). The RFC is an assessment, based on all relevant medical and other evidence, of a claimant's remaining ability to work despite his impairment. *See Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir.1997). The responsibility for determining the claimant's RFC rests solely with the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c).

Where the "ALJ misread the record evidence" to include an inconsistency that did not exist in the facts, to the extent that the ALJ relied on a non-existent inconsistency in discrediting the opinion, "the ALJ's decision to give [the] opinion 'no weight' is not supported by substantial record evidence." *Davis v. Astrue*, 287 F. App'x 748 (11th Cir. 2008). "If an ALJ misinterprets evidence that could influence his conclusion, a remand is appropriate." *Poole v. Freeman United Coal Min. Co.,* 897 F.2d 888, 895 (7th Cir. 1990).

## V. FACTS

The claimant has an eleventh grade education, has obtained a GED, and was forty-one years old at the time of the administrative hearing. (R. 70, 176). His past work experience involved working as a stocker, floor waxer, warehouse material handler, and customer service clerk. (R. 80, 82-87, 172-73, 178, 180-83). The claimant alleged that he was disabled by bipolar

4

disorder, deteriorating discs in his back, an inability to concentrate, mood swings, anger, constant

shoulder pain, and pinched nerves in his back beginning June 28, 2008. (R. 172).

*Physical and Mental Limitations*

On May 20, 2005, the claimant visited St. Vincent's Hospital complaining of back pain

extending into the left leg. Dr. Rafael Coplin performed an unenhanced MRI of the lumbar spine.

Dr. Coplin found that the claimant had

> grossly normal sagittal imaging at L1-2; minimal facet hypertrophy with
> no definitive sequels at L2-L3; mild, bilateral facet hypertrophy with no
> definitive sequel noted at the L3-L4 region; a small posterior central disk
> protrusion and bilateral facet hypertrophy at L4-L5 with no significant
> neural foraminal narrowing with minimal encroachment upon but no
> impingement of descending L5 nerve roots; and possible impingement of
> the existing left L5 nerve root at L5-S1 with a diffuse disk bulge at L5-S1.

(R. 476-77). The treating physician also indicated that the MRI showed that the remainder

of the claimant's soft tissues were "grossly normal." *Id.*

On July 6, 2006, the claimant visited Prison Health Services at the Alabama Department

of Corrections for intake screening. He reported a history of back pain and bulging discs. The

claimant also complained of, at that time, hearing voices and experiencing hallucinations. The

treating medical staff noted that the claimant was calm, cooperative, alert, and oriented. The

claimant reported a previous suicide attempt by overdose in 2002. The treating medical staff

referred the claimant to Mental Health Services immediately. (R. 221).

From August 2, 2006, until his discharge from prison on September 13, 2009, the

claimant visited a psychiatrist, Dr. John Andrews, with the Mental Health Services at the Bullock

County Correctional Facility every three months. Initially, the claimant reported poor

memory/concentration, increased fatigue, poor appetite, history of self-harm, thoughts of hurting

others, hallucinations, self-critical thoughts, excessive guilt, feelings of worthlessness, hopelessness, mood swings, and paranoia. After his initial visit, prison officials had not placed the claimant on suicide watch or mental health observation. The claimant was initially active in prison mental health groups, and graduated from groups for depression, mental health, substance abuse, anxiety and stress management, and PTSD/trauma. Beginning with a January 26, 2009 visit, however, Dr. Andrews noted that the claimant had not been active in prison counseling and therapy. (R. 203-417).

Upon his release from prison on September 13, 2009, Dr. Andrews noted that the claimant was stable on Clonodine, Wellbutrin, Trilafon, and Tegretrol. In his discharge instructions, Dr. Andrews ordered the claimant to continue taking those medications. Dr. Andrews also ordered him to follow-up with Western Mental Health for mental health care after his discharge. The record contains no evidence of the claimant reporting to Western Mental Health. (R. 205).

On September 18, 2009, the claimant presented to the Department of Emergency Medicine at UAB Hospital with suicidal feelings, stating, "I want to kill myself." He reported to Dr. Andrew Edwards that he planned to step in front of a bus. Dr. Edwards noted that the claimant stated that he had attempted suicide multiple times in the past, including attempting overdosing and cutting. (R. 418).

The claimant indicated that he had a history of bipolar disorder, depression, feelings of emptiness, and that he angered easily. He reported to Dr. Edwards that he had decreased energy and concentration, paired with feelings of helplessness. He denied manic or psychotic symptoms. Dr. Edwards noted that the claimant stated he had been treated in prison with Wellbutrin,

Clonidine, and Tegretol. Dr. Edwards diagnosed the claimant with depression, likely manipulative-type behavior, and admitted the claimant to the Locked Unit of the hospital for safety. (R. 420-21).

Dr. Piotr Penherski, who treated the claimant while in the hospital, diagnosed him with depression, psychosis, personality disorder with schizoid and dependent traits, and gave him a GAF score of 60. Dr. Penherski noted that, at the time of discharge, the claimant denied depressive symptoms, psychotic symptoms, auditory or visual hallucinations, delusions, and suicidal and homicidal ideation. He also showed improved insight into his mental illness, and his thoughts were organized. The claimant was cooperative, exhibited normal speech, had organized thought process, and was alert and oriented. Dr. Penherski discharged the claimant on September 28, 2009 without limitation, and ordered him to follow-up at Indian Rivers Mental Health Center on October 15, 2009. (R. 422).

On October 15, 2009, Mina Price, Licensed Clinical Social Worker at Indian Rivers Mental Health Center, completed a mental status exam and a Global Assessment of Functioning exam of the claimant. The claimant reported to Ms. Price that he originally sought treatment at Indian Rivers because his medications were not working and he had become suicidal. He reported that he was taking Trazodone, Wellbutrin, Catapress, and Trifalon. He also reported telling the prison psychiatrist that his medications were not working for him, but stated that he was discharged on them anyways. The claimant reported that he was not happy with the side effects he experienced from Haldol because it made him feel run down, stiff, dazed, and confused. He reported to Ms. Price that he would like counseling for his sex offender crimes but had been unable to find anyone that specializes in that type of treatment. (R. 430).

Ms. Price diagnosed the claimant with bipolar disorder, sleep problems, anger problems, and rapid mood shifts. She ordered a psychiatric evaluation and medication monitoring for one year.  Ms. Price noted that the claimant was well-groomed, had clear speech, complained of paranoid delusions, denied suicidal thoughts, denied hallucinations, and had a logical thought process. Ms. Price also noted that the claimant had severe judgment, memory, and attention/concentration impairments. (R. 431-33).

In her functioning assessment, Ms. Price noted that the claimant had an extremely severe impairment of problems in functioning for leisure and social networking activities, including relaxing in a variety of activities, getting along with friends, neighbors, coworkers, and other peers, and engaging in community activities and services. Ms. Price also stated that the claimant had a severe impairment in taking care of health issues, managing moods, taking medication as prescribed, and following up on medical appointments. She indicated that the claimant had a mild limitation in resolving basic problems of daily living and that the claimant had no impairment in getting along with family, complying with community norms, and dressing himself appropriately. Ms. Price's finding that the claimant had a GAF of 46.5 indicated that the claimant had a serious impairment or problem in either work, school, housework, relationships, problem solving, communication, or coping. (R. 435-36).

On November 14, 2009, the claimant's sister and roommate, Connie L. Jones, stated in a third-party function report that the claimant is unable to lift greater than five pounds, squat, bend, reach, walk, kneel, or climb stairs. Ms. Jones also reported that the claimant shops for his own groceries and personal items about two times per month. Further, she noted that the claimant walks outside up to three times on a nice day.

8

Ms. Jones indicated that the claimant did not want to engage in any social activities, only wanted to sit at home, had difficulty remembering to take his medication, and had difficulty remembering and understanding directions. She also reported that the claimant likes to read, watch television, and sew one to two times a week. She indicated that the claimant did not need someone to remind him to go places, nor did he require anyone to accompany him to places. Ms. Jones also noted that the claimant spent time with his mother, daughter, nephew, brother-in-law, and Ms. Jones every day at his house or his mother's house. (R. 158-66).

On January 6, 2010, Dr. Robert Estock, at the request of the Alabama Disability Determination Services, completed an assessment regarding the claimant's ability to perform basic mental work activities. Dr. Estock indicated that insufficient evidence existed to find a medical disposition. Dr. Estock did not physically see the claimant, and only reviewed the medical records provided to him. He indicated that he attempted to contact the claimant on more than one occasion to obtain medical records. (R. 452-53).

Dr. Estock diagnosed the claimant with psychosis, major depression, and personality disorder with schizoid and dependent traits. Under paragraph B of the § 12.04 Listing, Dr. Estock found insufficient evidence to make a determination as to restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. Dr. Estock did not find a degree of limitation that satisfies the functional criterion regarding episodes of decompensation, each of extended duration. Dr. Estock also found that the evidence did not support a finding under paragraph C of the § 12.04 Listing for a medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, including either

repeated episodes of decompensation of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause the individual to decompensate, or a current history of one or more years inability to function outside a highly supportive living arrangement and continued need for such arrangement. (R. 441-453).

On March 11, April 9, and November 24, 2010, the claimant visited Indian Rivers Mental Health Center for follow-up appointments. The claimant reported no major medical diagnoses. The claimant reported that he was hospitalized in 2009, but had not continued medication. He reported that he was experiencing hallucinations, irritability, poor concentration, social isolation, rapid mood swings, uncontrollable anger, restlessness, and that he preferred to isolate himself from others. He also reported to the staff that he had a history of hitting hard objects when angered, and one suicide attempt the previous year while incarcerated. The claimant reported that he had experienced these symptoms for several years, but had not complied with treatment. He also noted a bad reaction to Haldol and Prozac, and a desire to return to treatment. At each visit with Indian Rivers, the facility performed a mental status exam, and each time, the staff noted the claimant as cooperative; having normal rate, rhythm, and volume of speech; having a goal-directed and coherent thought process; having paranoid delusions; denying suicidal thoughts; and alert and oriented. At the November vist, Dr. Ahmad prescribed the claimant Seroquel as a mood stabilizer, and noted that the facility was waiting for the vendor to see if it would pay for the drug. (R. 455-474).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits

10

and supplemental security income, the claimant requested and received a hearing before an ALJ on March 10, 2011. (R. 36). The claimant testified that his bipolar disorder, paranoia, and anger issues forced him to resign from his last job as a stocker and morning cleanup man at Food Lion in 2005. The claimant stated that he had problems with absenteeism or having to leave the job early because of his paranoia with large crowds. The claimant testified that he experienced mood swings, uncontrollable anger, and paranoia. His worst mental symptom is that he completely loses focus when someone wrongs him and testified that he gets so angry that he blacks out. The claimant responded that he had been through anger management four times—once before prison and three times in prison.  (R. 71, 74-75).

The claimant indicated that his worst physical problem was the deterioration in the lower part of his spine, causing constant lower back pain and pain in his left leg and knee. The claimant then stated that he had a copy of the MRI showing the deterioration in the lower part of his spine at his mother's house. The ALJ stated that she would hold the record open for one week so that the claimant's attorney could provide the MRI, and the claimant subsequently provided the MRI. (R. 75, 81).

The claimant reported that the Alabama Department of Corrections released him on or about September 13, 2009 for sex offenses. After his release, the claimant went to the UAB emergency room because he had run out of medication and experienced suicidal feelings. The hospital admitted him for a short period in September. He followed-up that hospital stay with a visit to Indian Rivers Mental Health Center, continued to visit that facility, and he had a future visit scheduled for March 15, 2010, to obtain more medication. Dr. Ahmad was his current doctor at Indian Rivers, and he first saw him in October of 2009. (R. 72, 74-77).

11

The ALJ questioned the claimant about his medications because the claimant's prison records indicated that he was stable when on his medications. The claimant reported that he told Dr. Ahmad to find him a new combination of medications because his current medication of Seroquel did not help him focus and concentrate the way that he did when he was in the controlled prison environment. (R. 75-77).

The claimant testified that the last time he took Haldol and Benadryl was in November 2010.  The claimant indicated that he was not currently taking medication because he could not afford Seroquel, that AstraZeneca had a program for him to obtain free medication, but that he had not been approved yet. A different Indian Rivers location planned to give the claimant medication samples at his upcoming March 15th visit. (R. 77-79).

The ALJ questioned the vocational expert, Dr. Robin Cook, about the claimant's work experience. The ALJ asked Dr. Cook to classify the claimant's past relevant work. Dr. Cook reported that the stock clerk job, retail, was semi-skilled, heavy exertion level; the floor waxer work was semi-skilled, and that she did not have an exertional level in terms of how that work was performed; the material handler work was semi-skilled, heavy exertion level; and the customer service clerk work was semi-skilled, light exertion level. (R. 84-87).

The ALJ then posed a hypothetical to Dr. Cook to assess an individual with the following limitations: has the claimant's age, education, and past work experience; is limited to a full range of sedentary work because of a back impairment with the ability to stand up as needed but not be off task; and would be limited to brief superficial contact with supervisors, coworkers, and the public, with no production quotas. The ALJ asked Dr. Cook if such a person would be able to do the claimant's past relevant work. Dr. Cook reported that the hypothetical person could not

perform the claimant's past relevant work. (R. 87-88).

The ALJ then asked Dr. Cook if the individual in the hypothetical could perform any jobs in the national and regional economy. Dr. Cook reported that such an individual could work as a document preparer of microfilm, with 350 jobs in Alabama and 29,840 nationally; and a final assembler, optical, with 275 jobs in Alabama and 22,895 nationally. (R. 88).

The ALJ then further limited the claimant to marked levels of social and occupational impairment. She told Dr. Cook that "marked" meant a rare ability to interact appropriately with supervisors, coworkers, and the public, and a rare ability to withstand stress, concentrate, persist, and work at a production pace. Dr. Cook stated that given that set of limitations, such an individual would not be able to work competitively. (R. 90).

The ALJ then asked Dr. Cook to assess a second hypothetical, with the same limitations as the first hypothetical, but removing the production quotas limitation and making it repetitive work. Dr. Cook reported that such an individual could work as a semiconductor, bonder, with 250 jobs in Alabama and 35,190 nationally; and a taper, circuit layout, with 350 jobs in Alabama and 239,550 nationally. (R. 91-92).

*The ALJ's Decision*

On March 24, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 31). Before announcing her findings of fact, the ALJ described in great detail the five-step sequential evaluation process that would be the basis of her analysis. (R. 22-23).

First, the ALJ found that the claimant met the insured status requirement of the Social Security Act through December 31, 2009. Then, under the first step of the five-step sequential

13

evaluation process, the ALJ found that the claimant had not engaged in substantial gainful employment since the alleged onset of his disability. Next, the ALJ found that the claimant's history of degenerative disc disease and depression qualified as severe impairments. She concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. (R. 23).

The ALJ found that the claimant's physical impairments did not individually or in combination meet or medically equal the listings criteria of Appendix 1, Part 404, Subpart P of Regulation No. 4, nor did his mental impairments equal in severity a listed impairment. The ALJ noted that the severity of Listing 1.04 requires a spine disorder (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, or vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord with additional criteria. The ALJ found no evidence that the claimant had a compromise of a nerve root. Therefore, the ALJ could not find a conclusive disability at the third step of the sequential evaluation.

The ALJ found that the claimant's mental impairments did not individually or in combination meet or medically equal the listings criteria of 12.04 under 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ only discussed whether the claimant might have limitations for a mental impairment under listing 12.04, as the claimant did not have any mental impairment covered by the other listings.

The ALJ noted that to satisfy the paragraph B criteria of listing 12.04, the claimant's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in

14

maintaining concentration, persistence or pace; or repeated episodes of decompensation of extended duration. A marked limitation is a limitation that is more than moderate but less than extreme. The ALJ found that the claimant did not satisfy the paragraph B criteria for either listing, as the claimant had mild restrictions in activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence or pace. The ALJ determined that the claimant had experienced no episodes of decompensation of extended duration.

In reaching her daily living activities determination, the ALJ found that the claimant performed his own shopping for groceries and personal items about two times per month, and that the claimant reported no difficulties walking, traveling by car, or other physical limitations. Further, the ALJ noted that, at the hearing, the claimant appeared to be in no physical distress. The ALJ also stated that the claimant had not sought treatment.

In reaching her social functioning determination, the ALJ indicated that the claimant reported that he does not want to engage in any social activities and only sits at home; that he has a history of violent behavior; and that he has difficulty getting along with others secondary to his attitude, behavior, and depression. The ALJ noted, however, that the claimant reportedly spends time with his mother, daughter, roommate, and that it seems as though he is active socially within his small circle. The ALJ found that this evidence indicates that, in spite of his moderate limitations, the claimant is able to remain moderately functional in social situations.

In reaching her concentration, persistence or pace determination, the ALJ indicated that the claimant's roommate reported that the claimant has difficulty remembering to take his medication and has difficulty remembering and understanding directions; that the claimant

asserted at the hearing that his is barely able to focus, is unable to read a book, and cannot say the rosary; and that the claimant stated that he is unable to focus because of his medications. However, the ALJ found that despite his allegations of severity, the claimant's roommate reported that he has various hobbies, including reading, watching television, and sewing. The ALJ stated that these activities require a good deal of concentration and indicate that the claimant has some capacity to perform tasks requiring at least a minimal amount of concentration, persistence, or pace. (R. 24-25).

The ALJ also determined that the claimant did not satisfy the paragraph C criteria for listing 12.04. The AJJ found that the claimant did not qualify under paragraph C of 12.04, as he did not show

> a medically documented history of a chronic affective disorder of at least 2 years duration that has caused more than a minimal limitation of ability to do basic work activities, including either repeated episodes of decompensation of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would cause the individual to decompensate, or a current history of 1 or more years inability to function outside a highly supportive living arrangement and continued need for such arrangement.

The ALJ found that no evidence existed that the claimant's mental impairment rose to this extreme level of severity. (R.25).

The ALJ determined that the claimant had past relevant work as a stocker; floor waxer; warehouse material handler; and customer service clerk. She considered the claimant's subjective allegations of pain to determine whether he had the residual functional capacity to perform any available work. The ALJ found that the claimant's "medically determinable impairments could reasonable be expected to cause some of the alleged symptoms," but that "the claimant's

16

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the ... residual functional capacity assessment." (R. 29, 26-28).

To support her conclusion, the ALJ first noted that the claimant has severe degenerative disease and has complained of back pain since 2008. The ALJ stated that the claimant's May 2005 MRI indicated that the claimant has a severe back impairment as it has more than a minimal impact on the claimant's ability to perform work on a regular and continuing basis. (R. 26).

However, despite his allegations of severe pain, the ALJ found that the claimant is able to function well independently. The ALJ noted that the claimant's roommate reported that the claimant is able to shop for himself alone about twice per month. Further, the ALJ found no medical evidence in the record to show that the claimant has any physical limitations, such as an inability to walk, travel by car, or lift. The ALJ stated that in the claimant's September 2009 hospital visit, the claimant could move all of his extremities spontaneously with no limitations and exhibited no pain or limitation in his lower back. The ALJ noted that the record shows no medical evidence of the claimant undergoing treatment for his back, nor has he taken pain medication to manage his back impairment. The ALJ found that this behavior does not strengthen the credibility of the claimant's statements regarding his back impairment, and in fact, that the evidence would suggest that the claimant's back impairment is not so limiting as to prevent him from working if it does not even require pain management. (R. 26).

The ALJ then noted that the claimant has severe depression, and that the claimant was consistently in mental health treatment while incarcerated. The ALJ indicated that while in

prison, the claimant met with a psychiatrist every three months and was placed on Wellbutrin and Clonidine. The ALJ stated that the medical evidence showed that doctors assessed the claimant as complaint with his medication, and that the mental health evaluators found the claimant stable on these mental health medications. The ALJ found that the claimant reported irritability, poor concentration and focus, social isolation, and rapid mood swings. The ALJ indicated that at the claimant's September 2009 hospital visit, he reported uncontrollable anger, and that he had a history of violence related to his mental health issues. However, the ALJ noted, in that same visit, the claimant exhibited a normal rate, rhythm, and volume of speech; an appropriate thought process and thought content; and had a normal appetite and neutral effect. The ALJ also stated that the claimant reported suicidal ideation and past suicidal attempts, including drug overdose. (R. 26-27).

Again, the ALJ found that the claimant's behavior has not always been consistent with his allegations of severity regarding his mental impairment. The ALJ indicated that the claimant's medical records showed that he wants to return to mental health treatment, but never does. Further, the ALJ noted that the claimant has reported to the emergency room reporting suicidal thoughts for the past 10 years, but that it has gone largely untreated. The ALJ stated that the claimant reported that he had depression for many years, but that he did not take his medications because of a bad reaction to Haldol and Prozac. The ALJ found that the claimant's behavior was inconsistent with his allegations of severity. Furthermore, the ALJ indicated that the claimant's behavior conflicts with a diagnosis of severe depression as an individual with severe mental health issues would tend to seek treatment. Finally, the ALJ noted that the claimant's physicians described him as engaging in some manipulative type behavior. The ALJ found that the

18

claimant's behavior did not bolster the credibility of the claimant, and in fact, further degrades the credibility of his statements. (R. 27).

The ALJ considered and gave substantial weight to the opinion of Dr. Robert Estock, the State Disability Determination Services psychologist. The ALJ indicated that Dr. Estock found insufficient evidence to diagnose a mental impairment. The ALJ stated that even though Dr. Estock's opinion viewed the claimant as having an even greater ability to perform work-related tasks in a competitive environment, the ALJ gave more weight to the claimant's allegations and found his residual functional capacity more limited. The ALJ noted that she did not give controlling weight to Dr. Estock's opinion because he was a non-examining psychologist, but that the opinion is consistent with and supported by the record when considered in its entirety. (R. 28).

The ALJ considered and gave very little weight to the opinion of the claimant's sister and roommate, Connie L. Jones. The ALJ indicated that Ms. Jones stated in a third party function report that the claimant was unable to lift greater than five pounds, squat, bend, reach, walk, kneel, or climb stairs. The ALJ noted that Ms. Jones also reported that the claimant has the mental limitations of memory issues, difficulty completing tasks, concentrating, and following instructions. The ALJ found no evidence that Ms. Jones is either a medical expert or a vocational expert, with experience or training in making such determinations, and that Ms. Jones's findings were inconsistent with the record as a whole. (R. 28).

The ALJ considered and gave "some weight" to the opinion of Mina Price, LCSW, who completed a functional capacity assessment of the claimant. The ALJ stated that Ms. Price found that the claimant had a significant impairment in getting along with family, complying with

community norms, caring for his personal needs and cleanliness, and dressing himself appropriately. The ALJ then indicated that Ms. Price noted that the claimant had a mild limitation in resolving basic problems of daily living. The ALJ noted that Ms. Price reported that the claimant has no issues taking care of his needs, such as health issues, eating, relaxing in a variety of activities, getting along with friends, neighbors, coworkers and peers, and that he is able to engage in community activities and services. The ALJ found that Ms. Price is not considered an acceptable medical source, but that her opinion is mostly consistent with the record as a whole and indicates that although the claimant does have a severe mental impairment, he is in large part high functioning. (R. 28).

Based on the evidence and the opinions given, the ALJ concluded that the claimant's impairments left him with the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) and 416.967(a), with the following limitations: stand as needed but not be off task; can have only brief contact with supervisors, coworkers, and the general public; and perform only repetitive work. Based on these findings and the testimony from the vocational expert, the ALJ concluded that the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and, therefore, is not disabled under the Social Security Act. (R. 25, 30).

## VI. DISCUSSION

**1.  Because the ALJ gave some weight to a misreading of Ms. Price's report in her RFC finding, the ALJ's RFC assessment lacks substantial evidence to support it.**

The ALJ's decision misinterpreted, yet gave "some weight" to, the report of Ms. Mina Price, a licensed clinical social worker, who completed a functional capacity assessment of the claimant. Ms. Price found that the claimant showed "serious symptoms or seriously impaired

functioning in either work, school, housework, relationships, problem solving, communication, [or] coping" and opined that he probably could not sustain any productive activity. (R. 436). The ALJ, however, gave some weight to Ms. Price's opinion, in light of another observation she thought Ms. Price had made. Specifically, the ALJ quoted Ms. Price's report as commenting that the claimant "had a *significant* impairment in getting along with family, complying with community norms, caring for his personal needs and cleanliness and dressing himself appropriately." (R. 28) (emphasis added). She also quoted Ms. Price's reports as stating that "the claimant has *no* issues taking care of his needs such as health issues, eating, relaxing in a variety of activities, getting along with friends, neighbors, coworkers and peers, and is able to engage in community activities and services." *Id.* (emphasis added). This, the ALJ believed, rendered Ms. Price's opinion mostly consistent with the record as a whole and indicated that, although the claimant does have a severe mental impairment, he is in large part high functioning.

But what Ms. Price actually wrote was that the claimant "had an *extremely severe* impairment of problems in functioning for leisure and social networking activities, including relaxing in a variety of activities, getting along with friends, neighbors, coworkers, and other peers, and engaging in community activities and services." (R. 435) (emphasis added). Also, Ms. Price found that the claimant had "a *severe* impairment in taking care of health issues, managing moods, taking medication as prescribed, and following up on medical appointments." *Id.* (emphasis added). Finally, Ms. Price found that the claimant had "*no* impairment in getting along with family, complying with community norms, and dressing himself appropriately." *Id.* (emphasis added).

Not every misstatement damns an ALJ's decision to reversal. *See, e.g., Perez Torres v.*

21

*Sec'y of Health & Human Servs.,* 890 F.2d 1251, 1255 (1st Cir.1989) (finding that an ALJ's mistake as to the contents of the record did not justify reversing a denial of benefits). Nevertheless, this particular error was not harmless under the circumstances. Ms. Price was the only source to submit a comprehensive evaluation of the claimant's alleged mental disabilities. The claimant's argument that his mental condition was disabling relied on Ms. Price's findings. Even though Ms. Price is not a recognized medical source, the ALJ could consider Ms. Price's mental assessment in determining the severity of the claimant's impairments and how his impairments affect his ability to work.  See 20 C.F.R. § 404.1513(d)(3).  The ALJ accepted Ms. Price's assessment and gave it "some weight" because she believed Ms. Price had found the claimant to be in large part high functioning. (*See* R. 28.)

The only opinion to whom the ALJ gave any weight beyond that of Ms. Price was that of Dr. Estock. However, Dr. Estock found insufficient evidence to diagnose a mental impairment. Insufficient evidence is not substantial evidence to support an RFC assessment.

Beyond that point, the court cannot hypothesize about what the ALJ might have done had she interpreted Ms. Price's report correctly.  *See DiRocco v. Astrue*, 09-094S, 2010 WL 1490829, at *2 (D.R.I. Apr. 13, 2010).  Would the ALJ have given Ms. Price's correct opinion greater weight? Might that heavier weight, in turn, have led the ALJ to order a consultative examination in light of the insufficient evidence Dr. Estock's opinion noted? Only the ALJ can answer; presuming that she would have arrived at the same result would require this court to speculate. *See Id*.

In *Davis v. Astrue*, the Eleventh Circuit vacated and remanded the decision of an ALJ after the ALJ had misread the record evidence. 287 F. App'x 748 (11th Cir. 2008). There, the

22

ALJ misread the record evidence in finding a medical opinion repeatedly assessed the claimant's ability to function as "fair." *Id.* In light of this misunderstanding, the Court held that "as far as the ALJ relied on this stated inconsistency in finding that [the medical] opinion was not supported by the record, the ALJ's decision to give [the medical] opinion 'no weight' is not supported by substantial record evidence." *Id.*

"If an ALJ misinterprets evidence that could influence his conclusion, a remand is appropriate." *Poole v. Freeman United Coal Min. Co.,* 897 F.2d 888, 895 (7th Cir. 1990). As the analysis of similar facts in *Poole* makes clear, the mistakes in this case justify a remand. In *Poole*, a doctor had assessed the claimant as capable of lifting 40 pounds and carrying it 300 feet, but the ALJ quoted the distance as 30 feet. *Id.* The *Poole* court stressed that it was not in the position to speculate as to the consequences of that disparity:

> Given our standard of review, however, it is inappropriate for the court to supply a rationale for the ALJ's decision or to affirm on grounds other than those relied upon by the ALJ. Because the discrepancy could have been influential given the requirements of [the claimant's] work, we remand for the ALJ to address specifically each of the physical limitations listed in [the doctor's] report as it relates to the exertional requirements of [the claimant's] employment.

*Id.* (internal citations omitted). Because the inaccuracy "could have been influential" given the circumstances of the case, the court remanded the case to the Commissioner. *Id.; see also DiRocco*, 2010 WL 1490829, at *2.

The same reasoning applies in the present case. Here, the ALJ explicitly relied on the misreading of Ms. Price's opinion in finding that her opinion indicated that the claimant in large part was high functioning. However, like the court in *Poole*, this court cannot speculate as to how the ALJ's decision would have been affected by a proper interpretation of Ms. Price's findings. This court finds that substantial evidence does not support the ALJ's RFC determination given

23

his misstatement of and the weight given to Ms. Price's opinion. Therefore, this case is due to be reversed and remanded.

## VII. CONCLUSION

For the reasons as stated, this court concludes that substantial evidence does not support the ALJ's decision. Therefore, the court finds that the Commissioner's decision is to be REVERSED and REMANDED.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 31st day of March, 2014.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE